UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **FRANCIS BROUSSARD** | **CIVIL ACTION NO. 08-CV-0651** |
| VS. | **MAGISTRATE JUDGE METHVIN**<br>**BY CONSENT OF THE PARTIES** |
| **MICHAEL J. ASTRUE**<br>**COMMISSIONER OF SOCIAL SECURITY** | |

*RULING*

Before the court is an appeal of the Commissioner's unfavorable disability finding. Considering the administrative record, the briefs of the parties, and the applicable law, the court concludes that there is no substantial evidence to support the ALJ's finding that Francis Broussard was disabled prior to April 2, 2007. Accordingly, the Commissioner's decision is **REVERSED**.

*Background*

Broussard is 46 years old. He completed the 7th grade and only reads and writes "a little." Broussard has worked for the past 15 years as a general house painter.

Broussard was injured on January 7, 1999 when he was working as a painter and his co-worker fell off of his high stool, grabbed Broussard's arm on the way down, jerking Broussard's arm and neck.[1] On June 3, 1999, Dr. John Cobb, an orthopaedic surgeon performed an anterior cervical diskectomy and fusion at C6-7 on June 3, 1999.[2]

On December 1, 2005, Broussard protectively filed applications for disability insurance benefits and supplemental security income, alleging disability as of November 1, 2004 due to

---

[1] Tr. 242.

[2] Id.

neck and back pain and depression and anxiety. Broussard's last date of insured was December 31, 2005. Broussard's applications were denied initially and on reconsideration, and an administrative hearing was held before an administrative law judge on November 7, 2007, at which a vocational expert (VE) testified. On November 29, 2007, the ALJ issued a partially favorable decision. The ALJ found that Broussard was disabled beginning April 2, 2007.

The Appeals Council denied review on April 10, 2008, making the ALJ's decision the final decision of the Commissioner from which Broussard now appeals.

### *Assignment of Errors*

Because Broussard's last date of insured was December 31, 2005, he must show that is was disabled prior to this date to be entitled to supplemental security income prior to April, 2007 and any disability benefits.

Broussard raises three errors on appeal: (1) the ALJ erred in rejecting the Social Security consultive psychologist's opinion because the psychologist based his opinion on the combined impact of the claimant's physical pain and mental impairment; (2) the ALJ committed reversible error when he failed to incorporate Broussard's mental health limitations in his hypothetical to the expert; and (3) the ALJ erred in failing to adequately weigh the claimant's physical impairments and limitations particularly failing to address Dr. Brian Schulte's opinions.

### *Standard of Review and Procedure for Analysis of Impairments*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

3

236 (5th Cir. 1994).[3] In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992).[4]

When a mental disability claim is made, such as affective and depressive disorders, bipolar syndrome, panic attacks, and trauma-related anxiety symptoms here, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

---

[3] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

[4] The procedure is as follows:

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

Satterwhite v. Barnhart, 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).[5]

In the instant case, the ALJ determined that Broussard's degenerative disc disease of the cervical spine, status post diskectomy and fusion at C6-7, degenerative disc disease of the lumbar spine and depression are severe impairments. Relying on the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers which Broussard can perform, and therefore he is not disabled.

After careful consideration of the record, the court concludes that the ALJ's decision is supported by substantial evidence.

*Finding of Facts and Conclusions of Law*

**Administrative Hearing**

Broussard was originally hurt in 1999 at work when a co-worker grabbed and jerked Broussard's arm and neck. Dr. Cobb performed a diskectomy and fusion on Broussard's neck in June of that year.[6] Broussard returned to work in 2004 and spray painted houses but quit again because he was in a lot of pain.[7] Broussard testified he did not gain any relief in his upper back from his 1999 surgery, and Dr. Cobb has recommended more surgeries.[8] He was injured again in 2007, and his condition worsened.[9]

---

[5] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004).

[6] Tr. 260.

[7] Tr. 261.

[8] Id.

[9] Tr. 259.

5

Broussard testified to the following complaints since 2004: pain in his upper back between the shoulder blades; numbness in the back of his legs; and his left thigh burns all of the time;[10] sitting "shocks his lower back" and "makes [his] body tremble."[11] He uses a cane about 80% of the time that his family doctor prescribed; his arms are numb and tingle;[12] and he cannot bend down.

Broussard has been seeing Dr. Crackower since 2004 who prescribed Zoloft, Xanax, Lortab, and Oxycontin.[13] Dr. Crackower doubled his prescription after Broussard's 2007 accident.

He gets aggravated with people around him, has no hobbies, and cannot move his head up and down.[14] Broussard testified that he must lie down throughout the day; his legs give out on him and he cannot climb stairs; and he has trouble dressing himself and only drives short distances and waits while his wife goes in the store and then drives home.[15] Broussard has problems with his sex life because of the pain, and he is depressed and frustrated.

---

[10] Tr. 255, 256.

[11] Tr. 257.

[12] Tr. 258.

[13] Tr. 260-262.

[14] Tr. 263, 264.

[15] Tr. 264, 266.

6

**Medical History**

### *Back and Neck Pain*

**Dr. John Cobb**, orthopedist, performed an anterior cervical diskectomy and fusion at C6-7 on June 3, 1999 after Broussard's accident.

Broussard was injured again in 2007 in an auto accident. A report from Dr. Cobb shows that there was a disc protrusion right paracentral at L4-5 and a central protrusion at 5-1.

**Dr. Sydney Crackower, M.D.** treated Broussard on a monthly basis for his pain from approximately March 2004 through December 2006 for Broussard's herniated C-5 and C-6 discs with spinal nerve compression.[16] Throughout this period, Dr. Crackower diagnosed Broussard with moderate to severe pain and anxiety. Generally, he found that Broussard could sleep better; interact with his family, do light housework and yard-work, socialized better; worked more efficiently, and ambulated better. On May 14, 2004, Dr. Crackower indicated that Broussard was having trouble interacting with his family, working more efficiently, performing light yard-work, socializing and ambulating.[17]

**Dr. Brian Schulte, M.D.** performed a consultative examination on February 25, 2006.[18] Dr. Schulte noted that: Broussard ambulated slowly with a slight limp; was not using a cane at the time; was able to get on and off of the table and in and out of the chair with minimal difficulty and was able to dress himself except for lifting his shirt above his head. Broussard's

---

[16] Tr. 227-240, 212-222.

[17] Tr. 235.

[18] Tr. 153-156.

7

grip strength was 4/5 on the right and 5/5 on the left; he could make a fist and finger to thumb bilaterally. His lower extremity strength was 5/5.

Cervical spine flexion was less than 10 degrees; extension 10 degrees; lateral flexion 10 degrees bilaterally; rotation 50 degrees to the right; 60 degrees to the left. Lumbar spine flexion was 60 degrees; lateral 20; bilaterally 10 degrees.

Broussard's C spine x-rays showed significant degenerative disc disease at multiple levels and fusion plates and screws at C6-7. There were mild degenerative changes in his lumbosacral spine.

Dr. Schulte's impression was that Broussard had very chronic neck pain secondary to his ruptured discs and fusion and loss of some strength in his right upper extremity including grip strength; low back pain with some sensory loss in his left thigh; no weakness but decreased range of motion at the LS spine, hips and in squatting. He was not able to walk on his heels.

Dr. Schulte concluded that, on the overall, Broussard had moderate to severe pain on a daily basis, especially in his low back and neck, but that he did not require an assistive device although Broussard used one when walking to help with pain.

**Dr. Albert Heck**, a non-examining DHS neurologist, upon review of the evidence, concluded in March 2006 that Broussard could lift 20 pounds, carry 10, stand for 2 hours and had limitations as to reaching and right hand.[19]

**Dr. Jose Ruiz**, a non-examining DHS orthopedist, found on March 21, 2006 that Broussard's back pain was only partially credible because Dr. Crackower notes barely

---

[19] Tr. 158-159.

8

mentioned back pain as a significant issue and his x-ray showed only mild degenerative disease of the lumbar spine.[20]

Dr. Ruiz concluded there was a basis for neck pain secondary to cervical degenerative disc disease status post-fusion along with alleged right arm weakness.

Dr. Ruiz performed a physical RFC assessment and concluded that Broussard could occasionally lift 20 pounds; frequently lift 10 pounds, stand and/or walk and sit 6 hours per day; push/pull activities were limited to occasional due to right arm weakness; left arm is unlimited; and the use of a cane was not justified. He also found that Broussard was never able to climb ladders, ropes and scaffolds, and occasionally able to climb ramps and stairs, stoop, crouch and crawls. He also found that Broussard was limited to occasional overhead reaching and handling due to weakness.

### *Depression and Anxiety*

**Dr. Alfred E. Buxton, Ph.D.** provided a consultative examination on March 21, 2006.[21] Broussard complained of neck and back pain, depression, restless sleep, and poor energy and libido. Broussard stated that he stayed mostly to himself; his primary hobby was watching television; he could do minor food preparation and household chores; was able to shop, manage money, communicate and manage his time independently, and travel independently but only locally as needed.

Dr. Buxton noted that Broussard ambulated with a slight limp, and frequently changed positions "as if " he was in pain. Broussard's language skills were good for everyday simple

---

[20] Tr. 166-176.

[21] Tr. 160-163.

9

conversation; his ability to attend and concentrate were good; memory was intact; ability to attend and concentrate were good; pace was good; intellect normal; judgment and reflective cognition were good; mood was even; self-image poor; and goal orientation was positive. Dr. Buxton noted that Broussard was worrisome, sought to escape the stressor, had low tolerance for frustration, and infrequently experienced happiness. Dr. Buxton found that Broussard was alert, responsive, polite, cooperative and tried his best.

Dr. Buxton diagnosed major depression, insomnia, male erectile disorder and chronic pain. Dr. Buxton concluded:

> he is bright enough that he can understand simple as well as some complex instruction and command. However, even for relatively brief intervals of time he would have difficulty performing in a reliable and dependable fashion as an employee secondary to the combined negative impact of the mental health issues and the chronic pain on his functional capabilities. He would deteriorate under the accumulation of frustration and stress he would encounter in the job setting and one would see exacerbation in emotional pathology as well as the chronic pain. Ultimately, he would respond in a fashion that would work to his own demise. He may be able to establish minimally adequate interpersonal relationships with co-workers and supervisors alike but would have difficulty maintaining those relationships at this point in time secondary to the negative impact of the mental health issues and the chronic pain on those relationships.

***Non-examining DHS psychiatrist, Chang-Wuk Kang MD***, prepared a psychiatric review technique on April 11, 2006.[22] Dr. Kang concluded that, at most, Broussard had an adjustment disorder with mixed anxious and depressed mood that was not severe either as of that date or prior to the last date insured. Dr. Kang noted that Broussard had complained to Dr. Buxton that he got upset easily but that, to the contrary Broussard's mental status was unremarkable and mood was even during the examination.

---

[22] Tr. 176-191.

10

Dr. Kang concluded that Broussard was not restricted in his daily living activities; mild difficulties in maintaining social function; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.

*Analysis*

The issue before the court is whether the ALJ's decision that Broussard could sustain work prior to April 2, 2007 is supported by substantial evidence.

**Disabling Pain**

The ALJ concluded that, prior to April 2, 2007, Broussard could lift and carry ten pounds frequently and twenty occasionally; stand/walk/sit for six hours; and was able to perform overhead lifting with the right hand on an occasional basis, with no limitations in overhead lifting on the left and no limitations in the ability to perform tasks requiring fingering; and that he was should perform jobs with limited contact with the public.

A review of the medical records, as detailed above, shows that Broussard has had serious medical problems prior to his late date of insured, December 2005. Broussard has had chronic severe neck since his 1999 work-related accident.

Despite the medical evidence and Broussard's complaints, the ALJ determined that Broussard could a limited range of light work that existed in substantial number in the economy. In so finding, the ALJ discounted Broussard's complaints of disabling chronic neck pain:

> The claimant testified that he is not able to lift a gallon of milk and that he lies down during the day for an hour or more due to pain. He testified that he is not able to put on his socks and shoes and that he cannot lift his arm fore than half-way. As to the arm impairment, the undersigned has considered this complaint and finds that the claimant should only occasionally perform overhead reaching with the right arm; any limitations beyond that are not supported by the totality of the evidence.

11

> As to his back impairment, the claimant testified that his lower back has "always been this bad."
>
> On April 11, 2007, however, the claimant sought treatment from John Cobb, M.D. a surgeon, and told the doctor that his lumbar symptoms had gotten worse since the motor vehicle accident on April 2, 2007. The undersigned notes competing financial interests in this case, as the motor vehicle accident claim is worth more if injuries were sustained in that accident, whereas his disability claim is worth more of the lower back impairment, which has ultimately become disabling, was as bad in 2004 as it became after the accident in 2007. Though there may be motives of secondary gain in the claimant's report to his physician, as well as his testimony at the hearing, the undersigned finds the more accurate report was made to Dr. Cobb in April, 2007. The evidence regarding the claimant's back condition prior to that date is consistent with the claimant's report of an increase in symptoms after April 2, 2007 accident. The undersigned further notes that Dr. Crackower increased the claimant's Oxycontin from 20 mg to 40 mg following the April 2007 accident. This provides further evidence of an increase in the claimant's pain as of that time.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). The ultimate issue of disability is reserved to the Commissioner. Although the ALJ is entitled to make credibility determinations, when medical evidence supports complaints of pain and the opinions of physicians, the ALJ must have good cause for his credibility decisions. Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994);[23] Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). The ALJ's determination in this regard is entitled to considerable deference. Id. However, if uncontroverted medical evidence reveals a basis for the subjective complaints of pain, the "ALJ's unfavorable credibility evaluation of a

---

[23] "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Id. quoting, Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987). The ALJ is certainly able to decrease reliance on treating physician testimony for good cause. Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995). "Good cause for abandoning the treating physician rule includes 'disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.'" Id.

12

claimant's complains of pain will not be upheld on judicial review . . . at least where the ALJ does not on an articulated basis weigh the objective medical evidence in assigning reasons for discrediting the claimant's subjective complaints of pain."  Cook v. Heckler, 750 F.2d at 395.

The ALJ's decision to discount Broussard's credibility is not supported by substantial evidence of record.  The medical records contain overwhelming evidence that Broussard has chronic unrelenting neck and back pain prior to December, 2005.  The record clearly reflects objective medical reasons for Broussard's allegations of pain so that he cannot work and must lie down during the day for an hour or more due to the pain.  In reaching his decision that Broussard's neck pain restricted him to a limited range of light work, the ALJ concluded that Broussard:

> could lift and carry ten pounds frequently and twenty occasionally; stand/walk/sit for six hours; and was able to perform overhead lifting with the right hand on an occasional basis, with no limitations in overhead lifting on the left and no limitations in the ability to perform tasks requiring fingering; and that he was should perform jobs with limited contact with the public.
>
> In reaching this conclusion as to the claimant's physical limitations, weight has been given the opinion of Dr. Ruiz, as well as the consistent reports from Dr. Crackower that the claimant was able to perform light housework and light yard work from November 2004, which is the alleged onset of disability, through March 2007.

The fact that Dr. Crackower, Broussard's treating physician, felt that he could perform light yard and housework does not show that he can sustain work.  To the contrary, Dr. Crackower notes throughout his treatment of Broussard that he suffered from moderate to severe pain and he prescribed Lortab and Oxycontin, powerful narcotics, in the months prior to Broussard's 2007 accident after which he increased it even more.  Broussard testified that his neck fusion did not help his pain and that the Oxycontin only helped his pain a little and this is

supported by the fact that Dr. Crackower treated Broussard on a monthly basis for approximately two years.

The ALJ rejected Dr. Shulte's, the consulting examiner's opinion that Broussard had very chronic pain secondary to his ruptured discs on a daily basis. This was error. Dr. Schulte's opinion was supported by objective evidence, an x-ray showing significant disc disease at multiple levels and fusion plate and screws at C6-7. Moreover, Dr. Shulte's opinions are supported by Dr. Crackower's repeated conclusions over many months that Broussard suffered moderate to severe pain due to his neck injury.

The ALJ relied on the opinion of Dr. Ruiz, a non-examining physician's opinion that Broussard could perform 20/10/2 lift/carry/stand with limitations on reaching and right hand limitations but failed to explain why he discounted examining physician Dr. Shulte's opinion. This was error. *See* Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir.1990) (ALJ may rely on a non-examining physician's assessment only where it does not contradict the examining physician). Moreover, as stated, Dr. Shulte's opinions and Broussard's testimony are fully supported by objective medical evidence, including x-rays, and the opinions of his treating physician.

The evidence of record shows that Broussard's condition is of a chronic and severe nature, which prohibits him from engaging in work-related activities. The undersigned concludes, therefore, that the ALJ erred in discounting Broussard's allegations that he must lay down all day because the pain is so bad. Considering this, and the vocational expert's testimony that there are no jobs for a person with such limitations, the undersigned finds that the ALJ's

14

determination that Broussard can perform work that exists in significant numbers in the economy is not supported by substantial evidence.

### *Mental Impairments*

The ALJ concluded that Broussard was mildly limited in his daily living activities; had moderate difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation and that these were severe impairments.

In determining that Broussard did not have disabling mental impairments, the ALJ weighed the evidence:

> In addition to his physical impairments, the claimant has reported that he tends to stay to himself [and] becomes aggravated when he is around other people. Though he has not sought specialized mental health treatment, Dr. Crackower has prescribed antidepressants and anti-anxiety medication for the claimant. In documenting the claimant's functioning over the period from November 2004 to March 2007, Dr. Crackower consistently documented that the claimant was able to interact with his family and was able to socialize better. Thus, though the claimant may have some difficulties in this area, the claimant's treating source did not document disabling limitations.
>
> * * *
>
> Dr. Buxton conducted a psychological examination of the claimant in March 2006. On examination, the claimant presented as if he were in pain, but his ability to attend and concentrate remained good. His pace was even with a regular rate of performance and a normative response latency. Social skills were good, despite the claimant's reports of difficulty in that area. Recent and remote memories were intact, and goal orientation was positive. Mood was even with congruent affect. There was no evidence of hallucinations or delusion and no suicidal or homicidal ideation. Indeed, other than poor self-image, no abnormalities were noted on mental status examination. Dr. Buxton diagnosed the claimant with major depressive disorder of moderate severity, insomnia, erectile dysfunction and chronic pain. He went on to opine that the claimant is bright enough to understand simple, as well as some complex, instructions and commands, but that he would have difficulty performing in a reliable and

dependable fashion as an employee due to "the combined negative impact of the mental health issues and chronic pain on his functional capabilities."

The government challenges the ALJ's finding that:

> Dr. Buxton is a clinical psychologist. He is not a medical doctor or even a nurse or physician's assistant. There is no evidence that he has any training pertinent to the claimant's physical impairments. Though he offered diagnoses related to the claimant's physical condition, these lie outside his area of expertise. Dr. Buxton's opinion that the claimant is unable to work due, at least in part to his physical pain, is not given any weight in this matter, as Dr. Buxton is not qualified to give a medical opinion regarding the claimant's physical impairments and limitations.

Dr. Buxton is clearly entitled to opine on the effects of chronic pain on Broussard's ability to work. Pain Disorder is an accepted medical diagnosis as recognized by the American Psychiatric Association. *See* The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 2005), pps. 458-462. Moreover, as discussed, the evidence of record clearly supports Broussard's complaints of chronic pain. Accordingly, the undersigned finds that the ALJ's decision to give no weight to Dr. Buxton's opinions about the effects of Broussard's chronic pain is not supported by substantial evidence of record.

As to the effects of his anxiety and depression. Dr. Buxton's opinion that these conditions would preclude him from sustaining work is supported by medical evidence from Dr. Crackower showing that he treated Broussard for anxiety and depression and prescribed psychotropics throughout Broussard's months of treatment.

Broussard contends that the combined effects of his anxiety and depression, and neck and back pain preclude him from sustaining work. This is supported by Dr. Buxton conclusions that Broussard would not be able to maintain a job due to the combined negative impact of her

16

mental health issues, alcohol dependency, and medications.[24]  When discounting Broussard's credibility, the ALJ obviously relied upon the opinion of non-examining psychologist, Dr. Kang, that Broussard's anxiety and depression are not severe.  This was error.  *See* Villa, *supra*.  To the contrary, each Dr. Buxton's, an examining specialist, and Dr. Crackower's opinions reflect that Broussard's mental problems were chronic.

The overwhelming evidence of record shows that Broussard's impairments are chronic and severe.  There are no reports from any examining physician which contradict or dispute Dr. Buxton's opinion that Broussard's mental problems and chronic pain would preclude him from performing in a reliable and dependable fashion.  In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831.  We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

The vocational expert testified that an employee with Broussard's chronic pain and mental health issues would not be able to maintain a job. Considering the foregoing, the undersigned finds that the ALJ's determination that Broussard could perform work on a sustained basis is not supported by substantial evidence.

---

[24] See *supra*, p.5.

17

*Conclusion*

Considering the foregoing, the ALJ's decision is **REVERSED** and Broussard is to be awarded benefits with an onset date of November 1, 2004.

Signed at Lafayette, Louisiana, on November 24, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)